**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| JUDI DELIS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTH GORILLA INC., and TRINITY HEALTH CORPORATION,<br><br>Defendants. | **Case No.:**<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Judi Delis ("Plaintiff"), on behalf of herself and all others similarly situated, by and through her undersigned counsel, brings this Class Action Complaint against Health Gorilla, Inc. ("Health Gorilla") and Trinity Health Corporation ("THC") (collectively, "Defendants"). Plaintiff alleges the following upon information and belief and based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiff and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendants with sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively, "Private Information") that was impacted in a data breach (the "Data Breach" or the "Breach").

2. Plaintiff's claims arise from Defendants' respective failures to properly secure and safeguard Private Information that was entrusted to them and their accompanying responsibility to store and transfer that information.

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

3. This is a "hub-and-spoke" data breach, where Defendant Health Gorilla, the "hub", processes and maintains data for numerous clients, the "spokes", such as Defendant THC in this action.

4. Defendant Health Gorilla is a health information network and interoperability platform that operates as a Qualified Health Information Network ("QHIN") under the federal Trusted Exchange Framework and Common Agreement ("TEFCA") and as an Implementer under the Carequality framework. In that capacity, Health Gorilla serves as a gatekeeper that controls which entities may access patient medical records through these nationwide data exchange frameworks. As a gatekeeper, Health Gorilla had a duty to verify that entities requesting patient data had legitimate treatment purposes and proper authorizations before granting access. Health Gorilla's website promises "ironclad data security, privacy, and governance" that "protects patient data."[2] Defendant provides services to numerous medical facilities and providers (hereinafter, the "Clients" or "Defendant Health Gorilla's Clients").

5. Defendant THC is one of the largest not-for-profit Catholic health systems in the United States, operating 92 hospitals across 25 states with more than 133,000 employees. In connection with providing healthcare services, Defendant THC collects, stores, and maintains highly sensitive patient information, including clinical care details, demographic information, insurance information, and driver's license numbers. Defendant THC is one of Defendant Health Gorilla's Clients. As a Client, Defendant THC entrusted its patients' Private Information to Health Gorilla and had a duty to exercise reasonable care in selecting, vetting, and overseeing Health Gorilla as a vendor with access and control over the systems storing highly sensitive patient data.

6. Each Defendant independently owed numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to

---

[2] Health Gorilla, Powerful Security, https://www.healthgorilla.com/ (last visited Mar. 30, 2026) ("We maintain an ironclad data security, privacy, and governance program that protects patient data.").

Plaintiff and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

7. On January 13, 2026, Defendant THC was notified by its Health Information Exchanges ("HIE") partner that there was a potential unauthorized disclosure of its patients' PHI. On or around March 13, 2026, Defendant THC began issuing public notice of the Data Breach, and alleged that Health Gorilla, an HIE member, was involved in the Data Breach and a custodian of the Private Information exfiltrated in the Data Breach.[3]

8. According to a lawsuit filed on January 13, 2026, by Epic Systems Corporation, THC, and other healthcare providers against Health Gorilla in the United States District Court for the Central District of California (the "Epic Complaint") and according to reports, Health Gorilla enabled multiple entities to improperly access approximately 300,000 patient medical records from healthcare providers who use Epic's electronic health record system by falsely claiming the data was needed for treatment purposes.[4, 5] These entities had no legitimate treatment relationship with the patients whose records they accessed. The 300,000 figure represents only records accessed from Epic-using providers and does not account for records taken from providers using other electronic health record systems or from the U.S. Department of Veterans Affairs. [6]The precise number of THC-specific patients affected has not been publicly disclosed as of the date of this filing.

---

[3] *See* Vermont Att'y Gen., Security Breach Notice, https://ago.vermont.gov/document/2026-03-13-trinity-health-data-breach-notice-consumers (last visited Mar. 30, 2026).

[4] *Epic Sys. Corp. v. Health Gorilla, Inc.*, No. 2:26-cv-00321 (C.D. Cal. filed Jan. 13, 2026), Compl. ¶¶ 1-5, 139, 146, 161, 174, 176-177 (alleging that entities connected through Health Gorilla improperly accessed, from Epic customers alone, more than 42,000 patient records through RavillaMed, more than 140,000 through Mammoth, more than 100,000 through SelfRx, and more than 6,000 through GuardDog, all under purported treatment-purpose access through the Carequality and TEFCA frameworks); docket available at CourtListener.

[5] https://www.epic.com/epic/post/what-you-put-up-with-is-what-you-stand-for/ (last visited Mar. 30, 2026).

[6] https://www.epic.com/epic/post/what-you-put-up-with-is-what-you-stand-for/ (last visited Mar. 30, 2026).

9. Upon information and belief, Health Gorilla failed to implement adequate procedures to verify the legitimacy of data access requests before granting access to patient records. Health Gorilla permitted entities to access patient data based solely on their unverified representations that such access was needed for treatment purposes, without confirming whether those entities had any actual treatment relationship with the patients or proper authorizations to receive such information.

10. As a direct and proximate result of Defendants' respective failures to exercise reasonable care in vetting, monitoring, overseeing, and safeguarding the patient data and exchange pathways at issue, Plaintiff's and Class Members' sensitive personal and medical information was accessed by entities with no legitimate treatment purpose and disclosed without authorization.

11. The following types of Private Information were compromised in the Data Breach: clinical care details, demographic information, insurance information, and driver's license numbers.[7]

12. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Breach.

13. Each Defendant individually failed to take precautions designed to keep individuals' Private Information secure.

14. Each Defendant independently owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendant Health Gorilla, as the health information network and gatekeeper entrusted with Protected Health Information, owed duties under HIPAA and common law to safeguard such information by implementing and maintaining adequate cybersecurity measures. Defendant THC, as the health system who selected Health Gorilla and directed that patient data be provided to Health Gorilla, owed duties to properly vet, monitor, and supervise its third-party

---

[7] *See* Vermont Att'y Gen., Security Breach Notice, https://ago.vermont.gov/document/2026-03-13-trinity-health-data-breach-notice-consumers (last visited Mar. 30, 2026).

vendors. Each Defendant solicited, collected, used, and derived a benefit from the Private Information, yet each breached their respective duties by failing to implement or maintain adequate security practices.

15. The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves.

16. Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

17. Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

18. Plaintiff brings this class action lawsuit to address Defendants' respective inadequate safeguarding of Class Members' Private Information and their failure to provide timely and adequate notice to its Clients and their affected patients, including Plaintiff and Class Members, of the Breach and the types of information unlawfully accessed.

19. The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

20. Upon information and belief, Defendant Health Gorilla failed to properly monitor and implement security practices with regard to the computer network and systems that housed the Private Information, and Defendant THC failed to use reasonable care in vetting, monitoring, overseeing, and safeguarding the patient data and exchange pathways at issue.

21. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

22. Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for negligence, negligence *per se*, breach of implied contract, breach of third-party beneficiary contract, unjust enrichment, and declaratory judgment.

**PARTIES**

23. Plaintiff Judi Delis is a citizen and resident of Muskegon, Michigan.

24. Defendant Health Gorilla Inc. is a corporation maintaining its principal place of business at 2555 Ponce de Leon Blvd., Suite 300, Coral Gables, Florida 33134.

25. Defendant Trinity Health Corporation is an Indiana nonprofit corporation maintaining its principal place of business at 40600 Ann Arbor Rd E, Ste 201, Plymouth, Michigan 48170.

**JURISDICTION AND VENUE**

26. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendants' citizenships. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d) (2) (A). Defendant Health Gorilla has its principal place of business located in this District.

27. This Court has personal jurisdiction over Defendants because Defendant Health Gorilla is registered to do business and maintains its principal place of business in this District.

28. Venue is proper in this Court because Defendant Health Gorilla's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendants

29. Defendant Health Gorilla is a health information network and interoperability platform that serves as a gatekeeper that controls which entities may access patient medical records through these nationwide data exchange frameworks. As a gatekeeper, Health Gorilla was responsible for verifying the legitimacy of access requests and ensuring that only authorized entities with valid treatment purposes could obtain patient records.

30. Defendant THC is one of the largest not-for-profit Catholic health systems in the United States, operating 92 hospitals across 25 states with more than 133,000 employees. Defendant THC is one of Defendant Health Gorilla's Clients. THC had a duty to conduct reasonable due diligence before selecting Health Gorilla as a vendor and to establish appropriate oversight mechanisms to ensure Health Gorilla was properly safeguarding THC patient data and verifying that access requests were legitimate.

31. As a condition of doing business, Defendants require that patients entrust them with highly sensitive personal information belonging to Defendant Health Gorilla's Clients' patients. In the ordinary course of receiving service from Defendant Health Gorilla's Clients, Plaintiff and Class Members were required to provide their Private Information to Defendants.

32. Upon information and belief, Defendants made promises and representations to individuals, including Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained, including through their privacy policies.[8]

---

[8] Privacy Policy, available at https://www.healthgorilla.com/home/privacy-policy ("Health Gorilla is committed to protecting the privacy of individuals whose health information is stored or transmitted by our service and the users of any of our services.")(last accessed Mar. 30, 2026); *see also* Privacy Notice, available at https://www.healthgorilla.com/home/policies/patient-access-privacy-notice ("We store your data using a cloud services provider… We encrypt your data within our system…") (last accessed Mar. 30, 2026).

33. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

34. As a result of collecting and storing the Private Information of Plaintiff and Class Members for their own financial benefit, each Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and the Class Members' Private Information from disclosure to third parties.

**B. The Data Breach**

35. On January 13, 2026, Defendant THC was notified by its Health Information Exchanges ("HIE") partner that there was a potential unauthorized disclosure of its patients' PHI. On or around March 13, 2026, Defendant THC began issuing public notice (the "Notice") of the Data Breach, which states as follows:[9]

> Trinity Health hospitals and providers participate in automated electronic data exchanges called Health Information Exchanges ("HIEs") to support patient care, quality, and efficient care coordination. Federal regulations require that health information be shared electronically between doctors and hospitals involved in the treatment and care of shared patients.
>
> On January 13, 2026, we were notified by our HIE partner that there was a potential unauthorized disclosure of your health information. An HIE member called Health Gorilla, which manages the data exchange requests for certain other companies, stated your health information was needed for treatment purposes. However, the HIE has been unable to confirm Health Gorilla's statements or whether the recipient companies had authorizations for the information they obtained through the HIE.
>
> The health information that may have been disclosed varies based on the content of the information exchanged but may have included clinical care details, demographic information, insurance information, and potentially driver license numbers.

[9] *See* Vermont Att'y Gen., Security Breach Notice, https://ago.vermont.gov/document/2026-03-13-trinity-health-data-breach-notice-consumers (last visited Mar. 30, 2026).

36. According to a lawsuit filed on January 13, 2026, by Epic Systems Corporation, THC, and other healthcare providers against Health Gorilla in the United States District Court for the Central District of California (the "Epic Complaint") and according to reports, Health Gorilla enabled multiple entities to improperly access approximately 300,000 patient medical records from healthcare providers who use Epic's electronic health record system.[10, 11] The 300,000 figure represents only records accessed from Epic-using providers and does not account for records taken from providers using other electronic health record systems or from the U.S. Department of Veterans Affairs.[12] The precise number of THC-specific patients affected has not been publicly disclosed as of the date of this filing.

37. In other words, entities that had no legitimate treatment relationship with patients were able to fraudulently represent that they needed access to patient records for treatment purposes, and Health Gorilla granted that access without adequate verification. THC, in turn, failed to establish or enforce adequate contractual or oversight mechanisms to ensure that Health Gorilla was properly vetting access requests before disclosing THC patient data.

38. To be clear, there are numerous issues with Defendants' Data Breach, but the deficiencies in the Notice exacerbate the circumstances for victims of the Data Breach: (1) Defendant THC fails to state whether it or Defendant Health Gorilla were able to successfully contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Defendants continue to maintain is secure; (2) Defendant THC fails to state when the Breach itself occurred; and (3) Defendant THC failed to notify victims until two months after the Data

---

[10] *Epic Sys. Corp. v. Health Gorilla, Inc.*, No. 2:26-cv-00321 (C.D. Cal. filed Jan. 13, 2026), Compl. ¶¶ 1-5, 139, 146, 161, 174, 176-177 (alleging that entities connected through Health Gorilla improperly accessed, from Epic customers alone, more than 42,000 patient records through RavillaMed, more than 140,000 through Mammoth, more than 100,000 through SelfRx, and more than 6,000 through GuardDog, all under purported treatment-purpose access through the Carequality and TEFCA frameworks); docket available at CourtListener.

[11] https://www.epic.com/epic/post/what-you-put-up-with-is-what-you-stand-for/ (last visited Mar. 30, 2026).

[12] https://www.epic.com/epic/post/what-you-put-up-with-is-what-you-stand-for/ (last visited Mar. 30, 2026).

Breach was detected, depriving victims of the earliest opportunity to take preventative measures to protect their Private Information. All of this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity and wide array of information compromised in this specific breach.

39. Despite Defendant THC's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice, including: a) that this Data Breach involved entities that fraudulently claimed they needed patient data for treatment purposes; b) that Health Gorilla failed to verify these claims before granting access to patient records; c) that the unauthorized entities were able to view, exfiltrate, or download data through Health Gorilla's systems; and d) that once granted access, these entities targeted information including Plaintiff's and Class Members' Private Information and other sensitive information for download and theft.

40. Moreover, in its Notice, Defendant THC failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendants, and whether Defendants set up any mechanism for Class Members to report any misuse of their data.

41. Each Defendant independently had obligations created by the FTC Act, HIPAA, contract, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

42. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as properly encrypting the information or deleting it when it is no longer needed, or exercising reasonable care in vetting, monitoring, overseeing, and safeguarding the patient data and exchange pathways at issue.

43. The Data Breach resulted in unauthorized third-party accessing and acquiring files containing unencrypted Private Information of Plaintiff and Class Members. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

44. Upon information and belief, Plaintiff's Private Information, and that of Class Members, was subsequently published on the dark web following the Data Breach, as that is the *modus operandi* of criminals that commit cyber-attacks of this type.

45. Each Defendant individually failed to take precautions designed to keep individuals' Private Information secure.

46. Defendant THC should have but failed to exercise care in selecting its IT vendors and failed to adequately audit and monitor the data security practices of Defendant Health Gorilla to whom it entrusted the care and safeguarding of Plaintiff's Private Information. Further, Defendant THC failed to ensure Defendant Health Gorilla maintained a sufficient verification process to ensure data exchange requests were legitimate.

47. Defendant Health Gorilla could have prevented or mitigated the consequences of the Data Breach by having a sufficient verification process to ensure data exchange requests are legitimate, implementing clearinghouse practices to delete or redact data that they were no longer required to maintain, properly encrypting data at rest and in transit, implementing multi-factor authentication, and monitoring their systems to detect unauthorized access or the transfer of large volumes of data to third party networks.

48. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Breach, and as such, they will remain at risk that their data will be illegally used in the future.

**C. Defendants' Failure to Prevent, Identify, and Timely Report the Data Breach**

49. Each Defendant respectively failed to take adequate measures to protect Plaintiff's and Class Members' Private Information against unauthorized access.

50. The Private Information that Defendants allowed to be exposed in the Data Breach is the type of private information that each Defendant knew or should have known would be the target of attacks.

51. Defendant THC, as a healthcare provider, was aware of the risks inherent in entrusting sensitive medical and personal data to third-party vendors.

52. Defendant Health Gorilla, as a health information network and gatekeeper, was aware of the value of such data to cybercriminals, and of ransomware attacks targeting healthcare-related systems.

53. Despite their own knowledge of the inherent risks of cyberattacks and schemes to acquire Private Information, and notwithstanding the FTC's data security principles and practices,[13] Defendants failed to disclose that both their own security practices and their vendors' security practices were inadequate to reasonably safeguard Plaintiff's and Class Members' Private Information.

54. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[14] Immediate notification of a Data Breach is critical so that those impacted can take measures to protect themselves.

**D. The Data Breach Was Foreseeable and the Defendants Were Aware of Its Risk**

55. It is well known that Private Information, including PHI in particular, is an invaluable commodity and a frequent target of hackers.

56. In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[15] From 2018 until 2023, companies maintaining PHI, such as Defendants, experienced the most data breaches among all measured industries.[16] In 2024, healthcare was the second most targeted industry for data compromises behind only financial services. [17]

---

[13] *Protecting Personal Information: A Guide for Business,* FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last visited Mar. 30, 2026).
[14] *Id.*
[15] *2024 Data Breach Report*, ITRC (Identity Theft Resource Center) (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last accessed Mar. 30, 2026).
[16] *Id*.
[17] *Id*.

57. Individuals place a high value not only on their Private Information, but also on the privacy of that data. For the individual, identity theft causes significant negative financial impact on victims as well as severe distress and other strong emotions and physical reactions.

58. In light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), BJC Health System (286,876 patients, March 2020), and 23andMe., Inc. (20 million records, October 2023), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

59. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

60. Despite the prevalence of public announcements of data breach and data security compromises, their own acknowledgments of data security compromises, and their own acknowledgment of their duties to keep Private Information private and secure, each Defendant individually failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

61. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendant Health Gorilla's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

62. The ramifications of Defendants' respective failures to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

63. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' respective failures to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

64. As entities in possession of and responsible for Plaintiff's and Class Members' Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems and network were breached. This includes the significant costs imposed on Plaintiff and Class Members because of a breach. Nevertheless, each Defendant individually failed to take adequate preventative measures to prevent the Data Breach.

**E. The Value of Private Information**

65. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

66. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

---

[18] 17 C.F.R. § 248.201 (2013).
[19] *Id.*
[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Mar. 30, 2026)

67. Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[21]

68. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[22]

69. According to the national credit bureau Experian:

> A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

70. According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[23] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form

---

[21] *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, *available at:* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last accessed Mar. 30, 2026)

[22] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last accessed Mar. 30, 2026)

[23] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last accessed Mar. 30, 2026)

> that requires ID verification, or use the information to craft curated social engineering phishing attacks."[24]

71. Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[25]

72. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[26]

73. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the healthcare industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

74. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[27] Indeed, during 2019 alone, over 41 million healthcare records were exposed,

---

[24] *Id.*

[25] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html(last accessed Mar. 30, 2026)

[26] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last accessed Mar. 30, 2026)

[27] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last accessed Mar. 30, 2026).

stolen, or unlawfully disclosed in 505 data breaches.[28] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[29]

75. According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[30]

76. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[31]

77. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[32] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[33]

---

[28]https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed Mar. 30, 2026).

[29]https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/ (last accessed Mar. 30, 2026).

[30] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed Mar. 30, 2026)

[31] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed Mar. 30, 2026).

[32] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Mar. 30, 2026).

[33] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/ (last accessed Mar. 30, 2026)

78. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information… [is] worth more than 10x on the black market."[34]

79. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

80. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[35]

81. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**F. Defendants Failed to Comply with FTC Guidelines**

82. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendants, should employ to protect against the unlawful exposure of Private Information.

---

[34] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Mar. 30, 2026)

[35] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last accessed Mar. 30, 2026)

83. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should: (i) protect the personal customer information that they keep; (ii) properly dispose of personal information that is no longer needed; (iii) encrypt information stored on computer networks; (iv) understand their network's vulnerabilities; and (v) implement policies to correct security problems.

84. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

85. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

86. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

87. Each Defendant's respective failures to employ reasonable and appropriate measures to protect against unauthorized access to individuals' Private Information, including THC's failure to properly vet, monitor, and supervise Health Gorilla and Health Gorilla's failure to secure the systems where the Private Information was stored, constitute an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**G. Defendants Fail to Comply with HIPAA Guidelines**

88. Defendants are covered entities under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part

164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

89. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[36] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

90. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

91. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

92. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

93. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

94. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

[36] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforce.

95. HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

96. Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

97. HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

98. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[37]

99. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

100. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in

[37] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).(last accessed Mar. 30, 2026)

violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

101. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[38] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[39]

**H. Defendants Failed to Follow Industry Standards**

102. Experts studying cybersecurity routinely identify companies such as Defendants as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

103. Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendants. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; limiting which employees can access sensitive data; and properly vetting companies that intend to access private information.

---

[38] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html. (last accessed Mar. 30, 2026)

[39] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html. (last accessed Mar. 30, 2026)

104. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; protecting against any possible communication system; and training staff regarding critical points.

105. Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendants should have promptly deleted any data that they no longer needed as it relates to Plaintiff and the Class.

106. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO04), NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

107. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

**I. The Harm Caused by the Data Breach Now and Going Forward**

108. Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). When "identity thieves have your

personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[40]

109. The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft.

110. Plaintiff and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

111. Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

112. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.[41]

113. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[42] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[43]

114. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For

---

[40] *Prevention and Preparedness*, New York State Police, https://troopers.ny.gov/prevention-and-preparedness (last visited Mar. 30, 2026).
[41] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Mar. 278, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Mar. 30, 2026).
[42] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Mar. 30, 2026).
[43] *Id.*

example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[44] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[45]

115. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[46]

116. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[47] Defendants did not rapidly report to Plaintiff and Class Members that their Private Information had been stolen.

117. As a result of the Data Breach, the Private Information of Plaintiff and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiff and Class Members, or likely to be suffered as a direct result of Defendants' Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendants with the mutual understanding that Defendants would

---

[44] *Id.*

[45] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Mar. 27, 2015) https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Mar. 30, 2026).

[46] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020) https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion (last visited Mar. 30, 2026).

[47] *Id.*

safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further injurious breaches so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members' Private Information.

118. In addition to a remedy for economic harm, Plaintiff and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

119. Each Defendant disregarded the rights of Plaintiff and Class Members by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their network servers and the Private Information were protected against unauthorized intrusions; (b) failing to disclose that they nor their third-party vendors, did not have adequately robust security protocols and training practices in place to safeguard Plaintiff and Class Members' Private Information; (c) failing to take standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

120. The actual and adverse effects to Plaintiff and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly or proximately caused by Defendants' wrongful actions and/or inaction and the resulting Data Breach require Plaintiff and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiff and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

***Plaintiff's Experience***

121. Plaintiff is a patient of Defendant THC, one of Defendant Health Gorilla's Clients.

122. As a condition of obtaining medical services from Defendant THC, Plaintiff was required to provide Defendant THC with her Private Information, which it then provided to Defendant Health Gorilla.

123. Upon information and belief, Defendants were in possession of Plaintiff's Private Information before, during, and after the Data Breach.

124. Plaintiff provided her Private Information to Defendants and trusted that they would use reasonable measures to protect it according to state and federal law.

125. In entrusting her Private Information to THC, Plaintiff believed that, THC and any vendors it chose like Health Gorilla, would adequately safeguard that information. Had Plaintiff known that THC and its vendor Health Gorilla did not utilize reasonable data security measures, and that THC did not ensure that third-party vendors utilized reasonable data security measures, Plaintiff would not have entrusted his Private Information to THC.

126. Plaintiff greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

127. Plaintiff stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

128. As a result of the Data Breach, Plaintiff believes her Private Information was or will soon be published on the dark web.

129. As a result of the Data Breach, Plaintiff has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords

and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

130. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in notifying her of the fact that her Private Information was acquired by criminals as a result of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

131. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

132. Plaintiff has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

133. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because each Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now have her sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendants obtained from Plaintiff; and (g) other economic and non-economic harm.

## CLASS ALLEGATIONS

134. Plaintiff brings this class action, individually and on behalf of the following Nationwide Class:

> Nationwide Class: All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "Class", and the individuals in the Class, the "Class Members").

135. Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendants, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

136. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

137. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

138. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. It is estimated that the Class is comprised of at least 300,000 members, if not more. The Class is sufficiently numerous to warrant certification.

139. Typicality of Claims: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had her Private Information compromised as a result of the Data Breach. Plaintiff is a member of the Class, and her claims are typical of the claims of the members of the Class. The harm suffered by Plaintiff is similar to that suffered by all other Class Members which was caused by the same misconduct by Defendants.

140. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

141. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it

impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

142. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c. Whether Defendants' storage of Plaintiff and Class Members' Private Information was done in a negligent manner;

d. Whether Defendant THC breached implied contracts with Plaintiff and Class Members;

e. Whether Defendant Health Gorilla breached third-party beneficiary contracts with Plaintiff and Class Members;

f. Whether Defendants had a duty to protect and safeguard Plaintiff and Class Members' Private Information;

g. Whether Defendants' conduct was negligent;

h. Whether Defendants' conduct violated Plaintiff and Class Members' privacy;

i. Whether Defendants took sufficient steps to protect individuals' Private Information;

j. Whether Defendants were unjustly enriched; and

k. The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

143. Information concerning Defendants' policies is available from Defendants' records.

144. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

145. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

146. Given that Defendants have not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

**COUNT I**
**NEGLIGENCE**
**(On behalf of Plaintiff and the Nationwide Class against Defendants)**

147. Plaintiff restates and realleges paragraphs 1 through 146 above as if fully set forth herein.

148. Each Defendant knowingly collected, possessed, and maintained Plaintiff's and Class Members' Private Information, and therefore had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

149. Specifically, Defendant THC collected and maintained Private Information in its capacity as healthcare provider.

150. Defendant Health Gorilla collected and maintained Private Information through its position as an information network and gatekeeper that controls which entities may access patient medical records.

151. Defendant THC directed the collection and transmission of sensitive patient Private Information to Defendant Health Gorilla and owed independent duties to oversee and supervise the vendor.

152. Each Defendant had an independent duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' Private Information.

153. Defendant Health Gorilla, as the information network and gatekeeper, had a duty to implement cybersecurity controls and intrusion detection systems.

154. Defendant THC, as the company who selected and directed use of these vendors, had a duty to conduct due diligence and ongoing oversight of its vendors' security practices.

155. Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for criminals.

156. Each Defendant independently owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect the Private Information in their possession by using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

e. To exercise reasonable care in vetting, monitoring, overseeing, and safeguarding the Private Information:

f. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

g. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

157. Each Defendant's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

158. Each Defendant's duty also arose because Defendants were bound by industry standards to protect the confidential Private Information entrusted to them.

159. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and each Defendant independently owed them a duty of care to not subject them to an unreasonable risk of harm.

160. With respect to Defendant Health Gorilla specifically, its negligent acts and omissions include: (a) failing to implement adequate administrative, technical, and physical safeguards as required under HIPAA; (b) failing to conduct regular risk assessments of its systems and networks; (c) failing to implement adequate encryption and data protection measures; (d) failing to implement adequate access controls for the systems containing Private Information; (e) failing to detect and prevent the ransomware intrusion; (f) failing to maintain adequate audit and monitoring systems.

161. With respect to Defendant THC specifically, its negligent acts and omissions include: (a) failing to conduct adequate due diligence before selecting Defendant Health Gorilla as a vendor; (b) failing to require adequate contractual security obligations from Defendant Health Gorilla; (c) failing to conduct ongoing oversight and monitoring of Defendant Health Gorilla's security practices; (d) failing to audit or verify that Defendant Health Gorilla maintained adequate security controls; and (e) failing to terminate or take corrective action against vendors that did not maintain adequate security.

162. Each Defendant, through its respective actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff and Class Members' Private Information within each Defendant's possession.

163. Each Defendant, by their its respective actions and/or omissions, unlawfully breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

164. Each Defendant, by its respective actions and/or omissions, unlawfully breached its duty of care by failing to promptly identify and prevent the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

165. Each Defendant breached its respective duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by each Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Failing to exercise reasonable care in vetting, monitoring, overseeing, and safeguarding the patient data and exchange pathways at issue,

e. Allowing unauthorized access to Class Members' Private Information;

f. Failing to comply with the FTCA and HIPAA;

g. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

h. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

166. Each Defendant acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

167. Defendants had a special relationship with Plaintiff and Class Members. Plaintiff and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions. Moreover, only Defendants had the ability to protect their systems (and the Private Information that they stored on them) from attack or wrongful access.

168. Each Defendant's respective breach of duties owed to Plaintiff and Class Members caused Plaintiff and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

169. Each Defendant's respective breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

170. As a result of Defendants' negligence in breach of their respective duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

171. Each Defendant also had independent duties under state laws that required them to reasonably safeguard Plaintiff and Class Members' Private Information and promptly notify them about the Data Breach.

172. As a direct and proximate result of Defendants' respective negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

173. The injury and harm that Plaintiff and Class Members suffered were reasonably foreseeable.

174. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

175. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On behalf of Plaintiff and the Nationwide Class against Defendants)**

176. Plaintiff restates and realleges paragraphs 1 through 146 above as if fully set forth herein.

177. Pursuant to Section 5 of the FTCA, each Defendant had a duty to provide fair and adequate computer systems and data security protocols to safeguard the Private Information of Plaintiff and Class Members.

178. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., each Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

179. Specifically, pursuant to HIPAA, each Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

180. Defendant Health Gorilla violated these standards by failing to implement adequate security for the healthcare data in its custody, and failing to properly verify if data exchange requests were legitimate.

181. Defendant THC violated these standards by failing to oversee and supervise its third-party vendor to ensure compliance with applicable security standards.

182. Specifically, each Defendant breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

183. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of each Defendant's duty in this regard.

184. Each Defendant also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

185. It was reasonably foreseeable, particularly given the growing number of breaches of Private Information, that the failure to reasonably protect and secure Plaintiff and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants' networks, databases, and computers that stored Plaintiff and Class Members' unencrypted Private Information.

186. Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and Defendants' respective failures to comply with both constitute negligence *per se*.

187. Plaintiff and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

188. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

189. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

190. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On behalf of Plaintiff and the Nationwide Class against Defendant Health Gorilla)**

191. Plaintiff restates and realleges paragraphs 1 through 146 above as if fully set forth herein.

192. On information and belief, Defendants Health Gorilla, and THC entered into contracts with each other to provide data retention and exchange services, to the benefit of Plaintiff and Class Members.

193. Plaintiff and the Proposed Class Members are third-party beneficiaries of the contracts between Defendants Health Gorilla, and THC, under which Defendants Health Gorilla, and THC received Plaintiff's and the Class Members' Private Information and stored that information in their computer network systems.

194. On information and belief, these contracts are virtually identical and were made expressly for the benefit of Plaintiff and Class Members, in that the contracts all related to the provision of services to Plaintiff and the Class.

195. Each Defendant knew that if it were to breach these contracts, Plaintiff and Class Members would be harmed.

196. Defendant THC knew that its patients would be harmed if the vendors it selected failed to safeguard their Private Information.

197. Defendant Health Gorilla knew that THC's patients would be harmed if it failed to safeguard their Private Information.

198. Defendants agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

199. Defendants breached the contracts they entered into by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately prevent or detect the Data Breach and notify Plaintiff and Class Members thereof.

200. Defendants each materially breached the contract(s) each had entered into by failing to safeguard the Private Information entrusted to them, including by Defendant THC failing to properly supervise third-party vendor Defendant Health Gorilla to ensure it safeguarded Plaintiff's and Class Members' Private Information, and Defendant Health Gorilla failing to properly review data exchange requests to ensure they were legitimate. These collective failures by Defendants amounted to breaches of the covenant of good faith and fair dealing.

201. Plaintiff and the Class were harmed by Defendants' breach of their contracts, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

202. Plaintiff and Class Members are also entitled to their costs and attorneys' fees incurred in this action.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
**(On behalf of Plaintiff and the Nationwide Class against Defendant THC)**

203. Plaintiff restates and realleges paragraphs 1 through 146 above as if fully set forth herein.

204. Defendant THC offered to provide services to Plaintiff and the Class Members in exchange for their Private Information.

205. Defendant THC entrusted the Private Information of Plaintiff and the proposed Class Members to third-party vendor Health Gorilla.

206. Plaintiff and the Class Members accepted Defendant THC's offer by providing Private Information to Defendant THC, and in turn to third-party vendor Health Gorilla, in exchange for receiving THC's services.

207. In turn, and through internal policies described in the preceding paragraphs, and other conduct and representations, Defendant THC, agreed it would not disclose the Private Information it collect to unauthorized persons and that it would safeguard Plaintiff's and the Class' Private Information.

208. Implicit in the parties' agreement was that Defendant THC would provide Plaintiff and the Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

209. Plaintiff and the Class Members would not have entrusted their Private Information to Defendant THC in the absence of such an agreement.

210. Defendant THC materially breached the contract(s) it had entered into with Plaintiff and the Class Members by failing to safeguard their Private Information, including the failure to supervise third-party vendor Health Gorilla to ensure Private Information was properly safeguarded, and by failing to notify Plaintiff and Class Members promptly of the Data Breach.

Defendant THC further breached the implied contracts with Plaintiff and the Class Members by:

a. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

b. Failing to ensure the confidentiality and integrity of electronic Private Information that Defendant THC created, received, maintained, and transmitted.

211. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendant THC'S material breaches of its agreement(s).

212. Plaintiff and the Class Members have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendant THC.

213. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

214. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

215. Defendant THC failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

216. In these and other ways, Defendant THC violated its duties of good faith and fair dealing.

217. Plaintiff and the Class Members have sustained injury-in-fact and damages because of Defendant THC's breaches of its agreements, including breaches thereof through violations of the covenant of good faith and fair dealing.

218. As a direct and proximate result of Defendant THC's breach of implied contract, Plaintiff and the proposed Class Members and are entitled to actual, compensatory, and consequential damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class against Defendants)**

219. Plaintiff restates and realleges paragraphs 1 through 146 above as if fully set forth herein.

220. This Count is pleaded in the alternative to Counts III and IV above.

221. Plaintiff and Class Members conferred a benefit upon each Defendant. Specifically, they provided Defendants with their Private Information.

222. Defendant THC received the benefit of Plaintiff's Private Information in providing its medical services.

223. Defendant Health Gorilla received the benefit of Plaintiff's Private Information to provide its data maintenance and exchange services.

224. In exchange for the aforementioned benefits, Plaintiff and Class Members should have had their Private Information protected with adequate data security.

225. Upon information and belief, Defendant Health Gorilla funds its data security measures entirely from its general revenue, including from payments made to it by its Clients on behalf of Plaintiff and Class Members.

226. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

227. Each Defendant has retained the benefits of their unlawful conduct, including the amounts of payment received indirectly from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that they failed to provide.

228. Each Defendant knew that Plaintiff and Class Members conferred a benefit upon it, which Defendants accepted. Each Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

229. If Plaintiff and Class Members had known that Defendants had not adequately secured or ensured that their vendors were properly securing their Private Information, they would not have agreed to provide such Private Information to Defendants.

230. Due to each Defendant's respective conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of their wrongful conduct.

231. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and

repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

232. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

233. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On behalf of Plaintiff and the Nationwide Class against all Defendants)**

234. Plaintiff restates and realleges paragraphs 1 through 146 above as if fully set forth herein.

235. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

236. Each Defendant owed a duty of care to Plaintiff and Class Members, which required them to adequately secure Plaintiff and Class Members' Private Information.

237. Each Defendant still possesses Private Information regarding Plaintiff and Class Members.

238. Plaintiff alleges that each Defendant's respective data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

239. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure Plaintiff's and Class Members' Private Information and to timely notify them of a data breach under the common law, HIPAA, and the FTCA;

b. Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect Private Information; and

c. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' Private Information.

240. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect Private Information in its possession, including the following:

a. Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating its Clients and their patients and customers about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

241. If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

242. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

243. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at

Defendants, thus preventing future injury to Plaintiff, Class Members, and others whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is the proper representative of the Nationwide Class requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 30, 2026

Respectfully,

By: *<u>/s/ Tonyia J. Johnson</u>*
Tonyia J. Johnson (FBN #1058251)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Telephone: 305-479-2299
tjohnson@shamisgentile.com

*Attorneys for Plaintiff and the Proposed Class*